# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

CANDY MANNISI,                  )
                                 )
                                 )
          Plaintiff,         )
                                 )
vs.                           )  Case No. 4:07 CV328 MLM
                                 )
                                 )
MICHAEL J. ASTRUE,       )
COMMISSIONER OF         )
SOCIAL SECURITY,         )
                                 )
         Defendant.      )
                                 )
                                 )

## MEMORANDUM OPINION

This is an action under Tile 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue ("Defendant") denying the application of Candy Mannisi ("Plaintiff") for Social Security benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 et. seq. Plaintiff filed a brief in support of the Complaint. Doc. 13. Defendant filed a brief in support of the Answer. Doc. 15. The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C § 636(c). Doc. 9.

## I.
## PROCEDURAL HISTORY

On March 24, 2005, Plaintiff filed an application for disability benefits with an alleged onset date of April 2, 2003. Tr. 116. Plaintiff alleged that she is disabled due to major depression, carpal tunnel syndrome, thyroid disease, allergies, and rhinitis. Tr. 187. On July 28, 2005, Plaintiff's claim

was denied. Tr. 101-105. Plaintiff requested a hearing which was held May 9, 2006, before Administrative Law Judge ("ALJ") Craig Ellis. Tr. 320-352. By decision dated September 26, 2006, the ALJ ruled that Plaintiff was not disabled under the meaning of the Social Security Act. Tr. 11-19. Plaintiff sought review of the ALJ's decision before the Appeals Council. Tr. 5-8. On December 14, 2006, the Appeals Council denied Plaintiff's Request for Review. Tr. 2-4. The decision of the ALJ, therefore, stands as the final decision of the Commissioner.

## II.
## TESTIMONY BEFORE THE ALJ

### A.    Plaintiff's Testimony:

Plaintiff testified that at the time of the hearing she was forty-one years old; that she was 5'5"; that she weighed 164 pounds; that she lived with her disabled husband, her daughter, her daughter's husband, and her daughter's two children; and that for income she and her family relied on Plaintiff's husband's $1,200 a month Social Security disability benefits. Plaintiff further testified that she earned a GED; that she completed three years of business college; and that she received Medicaid benefits until April 26, 2006. Tr. 324-330, 343.

Plaintiff also testified that she had been in jail once as a result of an altercation with her niece; that at the time of the hearing she had recently begun a sentence of five years probation for felony possession of a controlled substance; that in regard to the felony possession "they found drugs in [her] purse"; and that it was her only felony conviction. Tr. 326-328. Plaintiff also testified that she did not use "marijuana, cocaine, meth., anything like that."[1] Tr. 333.

_____

[1]    As set forth below, Plaintiff reported on December 29, 2004, to Psychologist Walter Major of the Community Counseling Center that she had been charged with "meth possession"; that she believed a "cop dropped a baggy of meth" in her purse; and that she was not taking drugs. Also, as set forth below, on January 21, 2005, Plaintiff reported to Shajitha Nawaz,

Plaintiff testified that she has been treated for carpal tunnel syndrome ("CTS") in her right hand; that her hands swell; and that she has trouble picking things up and writing. Tr. 336-40, 343.

Plaintiff further testified that she received medical treatment for her thyroid problem from Dr. Kohn for ten years prior to the hearing and that her treatment included her having blood drawn to monitor "how [her] medication [is] doing." Tr. 340-41. Plaintiff further testified that at the time of the hearing she was under the care of a psychiatrist, Dr. Nawaz. Tr. 331. Plaintiff said that she takes prescription medication for her thyroid; that she takes Zoloft; that she takes medication for acid reflux; that her taking medication for acid reflux "depends on the insurance" she has; and that irritability is a side effect of her medications. Tr. 340-41.

Plaintiff testified that she last worked in 2003 at Easy Money where she worked about twenty hours a week; that she stopped working at Easy Money because she could not handle the stress, because her acid reflux bothered her, and because she could not talk, add, or stay focused; and that she was "actually fired" from Easy Money. Tr. 330-31, 336

Plaintiff also testified that she goes to the grocery store "maybe once a month"; that when she goes to the grocery store she prefers to go late at night; that she does her own laundry; and that, at most, she drives four or five miles. Plaintiff said that she does not drive further because "I'm always going off the road. I can't keep my mind focused to watch, to stay on the road unless I have someone riding with me." Tr. 332-33, 339.

**B.** **Testimony of Vocational Expert:**

Vocational Expert Gary Weimholt (the "VE") testified that Plaintiff's past employment was

M.D., that she had legal problems at that time; that charges were pending against her relating to her husband's arrest for a "meth lab"; and that she had no history of drug problems.

medium semi-skilled and sedentary semi-skilled. Tr. 344-46.

The ALJ posed the following hypothetical to the VE: A person with the age, education and work experience of Plaintiff, who has no exertional limitations and who is not significantly limited in all twenty factors which are relevant to mental residual functional capacity except that the hypothetical person has moderate mental limitations in regard to the ability to "understand and remember detailed instructions," "carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity to others without being distracted by them," and "get along with co-workers or peers without distracting them or exhibiting behavior extremes." Additionally, the VE added the following limitations to this first hypothetical: "no constant and forceful gripping and grasping with the [dominate] right hand." Tr. 346-47.

The ALJ also posed a second hypothetical to the VE describing person with the same mental limitations and the same limitation in regard to the right hand as the person described in the first hypothetical, who is capable of lifting "50 pounds occasionally, 25 frequently," and can "sit, stand, or walk for about six hours over the course on an eight-hour work day." Tr. 347.

In response to questions from the ALJ the VE testified the person described in either hypothetical would not be capable of performing Plaintiff's previous work. Tr. 348. The ALJ asked the VE whether there would be other work available to such a person as described in the first the hypothetical. The VE testified that he thought the person described in the first hypothetical would be capable of working as an office cleaner, of which there were approximately 6,000 jobs in the state. He also testified that such a person could work as a hand packager "at the light and sedentary level" and that there were approximately 5,000 of those jobs in the state. The VE further testified that such a person, as described in the first hypothetical, would be able to work on a one or two-step bench

assembly job at the light and sedentary exertional level, of which there were approximately 5,000 jobs in the state. Tr. 348 -349. The VE also testified that the second hypothetical person would also be able to perform all of these types of jobs. Tr. 349.

Plaintiff's counsel asked the VE whether his conclusion would be affected if the person described in the ALJ's hypothetical, in addition to the exertional limitations described by the ALJ, had the additional limitation of a poor to fair "ability to cope with the stress and pressures of a routine work activity." Tr. 350. The VE responded "that if it [was] a continual condition, a chronic condition that's pervasive in terms of the ability to cope with work, then I think that would preclude these other jobs." Tr. 350. Plaintiff's counsel then asked whether the hypothetical person's ability to work would be limited by "her low mood and irritability." The VE testified that low mood and irritability would not impact her ability to perform the types of jobs listed above. Tr. 350. Plaintiff's counsel asked whether such a person's ability to work would be affected by a "moderate difficulty maintaining social functioning." The VE testified that such a limitation would not effect the person's ability to perform the types of jobs cited. Tr. 350-51.

### III.
### MEDICAL RECORDS

Records reflect that in January, February, and March 2001 and January through April 2002 Plaintiff was seen by psychotherapist Marlene Barni, MSW, LCSW, of Catholic Family Services. In an August 2, 2002 progress note Psychotherapist Barni reported that Plaintiff said "'everything is going good,' new job, kids are O.K." and that, except for a decreased libido caused by menopause, her relationship with her husband was fine. Records of this date further state that Plaintiff's mood was "much improved" and that her sleep, concentration and appetite were "good." Psychotherapist

Barni also reported that Plaintiff cancelled her appointment for August 16, 2002. Tr. 221.

Records of BJC Health Center dated August 13, 2002, reflect that Plaintiff presented complaining of a sinus problem for four days; that Plaintiff appeared alert; that Plaintiff's mood and affect were normal; that Plaintiff was assessed as having sinusitis and rhinitis; and that the plan was for Plaintiff to take medications including Allegra D, Nasocourt, and Afrin. Tr. 289-90. Robert F. Scheible, M.D., reported that x-rays of Plaintiff's sinuses taken on this date showed signs of "[i]nterval development of an air-fluid level in the right maxillary sinus with near complete opacification of the right maxillary new since 8-12-99." Tr. 301.

Records of BJC Health Center dated August 21, 2002, reflect that Plaintiff presented complaining about her sinuses; that she had abdominal pain from GERD; that Plaintiff appeared alert and was not in distress; that her mood and affect were normal; and that the assessment was GERD, thyroid problems and anxiety. Tr. 287-88.

Records of BJC Health Center reflect that Plaintiff presented on October 30, 2002, complaining of pain in her right scapula, a cough, and sinus drainage; that Plaintiff smoked a pack a cigarettes a day, was not a drug user, and occasionally used alcohol; that Plaintiff stated that her "depression and anxiety [was] better" and that she had stopped taking Zoloft two weeks prior; that Plaintiff was alert; that she was in no distress; that she was "oriented x 3"; that Plaintiff's mood and affect were normal; that Plaintiff did not have motor or sensory deficit; that the assessment included sinusitis, GERD, tobacco use, cough, and scapula pain; and that the plan for Plaintiff included follow-up with a psychologist and a referral to a gastro-intestinal specialist. Tr. 283-84. Geoffrey S. Hamill M.D., reported that x-rays taken on this date showed that Plaintiff's paranasai sinuses were clear. Tr. 299.

Records of BJC Health Center dated February 25, 2003, reflect that Plaintiff presented complaining of headaches off and on over the prior two weeks; that Plaintiff smoked; that Plaintiff was alert; that she was in no distress; that her mood and affect were normal; that she had no motor or sensory deficit; that the assessment was muscle tension, sinusitis and hypothyroidism; and that the plan was for Plaintiff to take medications and to follow up in four weeks.  Tr.  279-80.

Records of BJC Health Center reflect that Plaintiff presented on March 25, 2003, at which time she complained of tension in her neck and shoulders; that Plaintiff appeared alert; that her affect and mood were normal; that she did not appear distressed; that she did had no motor or sensory deficits; that the assessment on this date was muscle tension; and that Plaintiff's treatment plan included Soma, Vioxx, and Ultracet, moist heat, and a follow up visit in four weeks.  Tr. 275-76.

Records of BJC Health Center dated April 25, 2003, reflect that Plaintiff presented complaining of lower back pain which extended to her buttocks and left leg; that Plaintiff's mood and affect were normal; that the assessment on this date was sciatica; and that Plaintiff's plan included Darvocet and other medications.  Tr. 274.

In a Closing Summary dated May 23, 2003, Psychotherapist Barni stated that the reason for Plaintiff's treatment had been depression; that over the course of treatment Plaintiff had shown improvement; that treatment was terminated because "family withdrew"; and that Plaintiff was advised to return to treatment.  Tr. 220.

Psychotherapist Barni stated in a letter to Disability Determinations that Plaintiff came to her office "one time in November 2003, on the third.[2]  She was depressed and debriefed about her situation.  Another appointment was made for the following week but [Plaintiff] did not show up."

[2]        This letter is dated April 22, 2005.

Tr. 219.

On December 10, 2003, K.P.S. Kamath, M.D., completed a Medical Report Including Physician's Certification/Disability Evaluation for the Missouri Department of Social Services. On this form Dr. Kamath stated that Plaintiff had "major depression, single episode"; that she needed to be on medication; that she could not afford medication; and that Plaintiff was "clearly dysfunctional at this time." Tr. 254.

Dr. Kamath prepared a psychiatric evaluation of Plaintiff on January 27, 2004. Dr. Kamath reported that Plaintiff stated that her chief complaint was that "[I] could not take the stress of work. I just wanted to kill myself and others around me. I am going through menopause." Tr. 318. Dr. Kamath's evaluation states that he lacked significant medical records for Plaintiff. Dr. Kamath further reported that Plaintiff said that since she had surgery in November 2001 for an ovarian cyst she had been suffering from depression; that she had frequent suicidal ideas; that she took Zoloft since 2001; that she stopped taking Zoloft for financial reasons three months prior to the evaluation; that at the time of the evaluation she was working at a payday loan company; that she was not able to concentrate at work and made a lot of mistakes; that she cried all the time and had feelings of hopelessness and helplessness; that her husband was "on her case all the time" and "blame[d] her for everything." Tr. 318-19.

Dr. Kamath reported, in regard to Plaintiff's mental status, that there was no evidence of organicity; that Plaintiff's memory for past and present events was intact; that she was anxious; that she looked her age; and that she denied hearing voices or having persecutory ideas; and she was "sobbing and crying" in the waiting room and during the entire interview. Tr. 319.

In regard to Plaintiff's level of daily functioning, Dr. Kamath reported that Plaintiff got up

and went to bed at different times; that she slept "fair"; that "during the day she work[ed] when she [was] asked but [was] not happy with her performance"; and that she had no current hobbies or interests. Tr. 319.

Dr. Kamath's diagnosis was as follows: Axis I, "Major depression, single episode, moderate"; Axis II, "None"; Axis III, "None"; Axis IV, "Significant marital problems"; and Axis V, "55." Tr. 319.

Dr. Kamath further reported that Plaintiff did "fairly well on meds until 3 months ago when she quit it for lack of money"; that it appeared she needed to be on medication for the control of her symptoms of depression; that "at least until her depressive symptoms are controlled, she should be considered as not being able to perform her duty at any job"; that this "might take at least 6 months"; that her ability to relate to others is fair; that "there is a slight degree of social isolation"; that she is able to care for her basic personal needs; that she can comprehend and understand instructions; that she can perform simple repetitive tasks; that her ability to cope with stress and pressures of routine work activity is fair to poor; and that she can comprehend and follow basic personal and financial affairs. Tr. 319.

Records of BJC Health Center dated April 1, 2004, reflect that Plaintiff presented complaining of neck pain radiating into her right arm; that Plaintiff was alert; that Plaintiff had normal mood and affect; that Plaintiff had no motor or sensory deficit; that Plaintiff did not appear distressed; that the plan for Plaintiff included taking Darvocet and following up in four weeks; and that the assessment was a cervical strain and spasms. Tr. 272.

Records of BJC Health Center dated July 15, 2004, reflect that Plaintiff was seen on that date for pain and numbness in her right hand; that Plaintiff said that she had no relief with motrin; that

Plaintiff's mood and affect were normal; that Plaintiff had decreased grip in her right hand; that the assessment was CTS; and that the plan including Plaintiff's wearing a wrist splint and consulting a neurologist. Tr. 270-71.

Records of BJC dated August 8, 2004, reflect that Plaintiff complained of pain in her right arm; that Plaintiff also had a "scaly" rash on her upper left arm; that Plaintiff's mood and affect were normal; that Plaintiff had a "sensory loss"; that Plaintiff was a smoker; that the assessment on this date included CTS, GERD, rhinitis, and dermatitis; that Plaintiff's medical plan included taking Prevacid and applying an ointment to her rash. Tr. 268.

An Intake/Psychiatric History prepared by Walter Major, E.D.S., L.P.C., on December 29, 2004, states that Plaintiff stated that she "need[ed] a psychiatric evaluation to continue [her] disability" and needed "a psychiatrist to prescribe the anti-depressive medications"; that she had a lot of stress; that her depression had been "more on than off for a number of years"; and that she lost her job because of depression. The history prepared by Psychologist Major states that Plaintiff's medical history included swollen glands, thyroid problems, persistent thirst, irregular periods, and shortness of breath; that her current medications included Zoloft, Lebothyroxin, and Cohosh, the latter of which is over the counter; that Plaintiff's psychiatric history included therapy at Catholic Family Services; and that Plaintiff did not have psychiatric hospitalizations. The history further states that Plaintiff said she had a "current legal difficulty" as she was charged with "meth possession"; that she left her purse in her truck and believed that "the cop dropped the baggy of meth in [her] purse"; and that "she's not taken drugs and does not associate with people who do so." Tr. 211.

Psychologist Major reported that Plaintiff was well groomed and appropriately dressed; that her "[e]ye contact was poor much of the session"; that her motor behavior was "very restless and

10

fidgeting and moving around in the chair often"; that her responsiveness to questions was "alert"; that her perceptions appeared to be normal; that her thought processes were "somewhat evasive but fairly goal directed"; that there was no report of suicidal or homicidal ideation; that Plaintiff's affect "was somewhat restricted"; and that her "[s]peech was very rapid and mood appeared anxious, depressed, discouraged, angry and overwhelmed." Psychologist Major's impression was that Plaintiff was hyper, very talkative, and motivated by history. His provisional diagnosis was as follows: Axis I, Major Depressive Disorder, Recurrent Severe without Psychotic Features, ADHD, Hyper Compulsive Type (R/O)"; Axis II, "799.9"; Axis III, "Multiple physical problems"; Axis IV, " Legal (severe), Family (severe), Social (moderate)"; and Axis V, "55." Psychologist Major recommended that Plaintiff meet with a psychiatrist on January 21, 2005, "to complete a psychiatric evaluation and determine if medication management is appropriate" and that Plaintiff keep scheduled sessions with a psychiatrist. Tr. 211-12.

Obstetrics and Gynecology records of Dr. Christine Cernik reflect that Plaintiff was seen on January 21, 2005. Records of this date are not legible. Tr. 304.

On January 21, 2005, Shajitha Nawaz M.D., conducted a psychiatric evaluation of Plaintiff. Dr. Nawaz reported that Plaintiff said she felt depressed, tired, had difficulty focusing, had a loss of appetite, and did not care about things that she used to care about. Dr. Nawaz's report further states that Plaintiff said that Zoloft was helping; that she was not taking Zoloft regularly because of financial difficulties; that she was taking other medications including a muscle relaxer, antibiotics, and multi-vitamins; that she smoked between one-half and one pack of cigarettes a day; that she did not have suicidal and homicidal ideations; that she had a history of hypothyroidism, GERD, ovarian cyst, gallbladder removal, appendectomy, endometriosis, allergies, headaches, and carpal tunnel surgery;

that Plaintiff's previous work included secretarial, customer service and bus driver jobs; that she did not finish high school; and that she has a GED. Dr. Nawaz further reported that Plaintiff "denied drinking and using other substances." Tr. 206-207.

Dr. Nawaz's report states that said that her husband had been arrested "for meth lab" and that there were "[l]egal charges pending against [her]." Tr. 206.

Dr. Nawaz reported that Plaintiff was alert, awake and oriented; that her speech was "circumstantial"; that Plaintiff said her mood was "ok at this moment"; that her affect was "dramatic at times"; that Plaintiff denied hallucinations and delusions; that her attention/concentration and memory were intact; that her sleep was "ok"; and that her appetite was "decreased." Dr. Nawaz's diagnostic impression was as follows: Axis I, "Major Depressive Disorder, Recurrent R/O Mood Disorder Secondary to medical condition, R/O Bipolar Mixed, ADHD"; Axis II, "Personality Disorder NOS"; Axis III, "Hypothyroidism, cyst removal, appendectomy, gallbladder removal"; Axis IV, "Social (moderate), Financial (severe)"; and Axis V, "50." Dr. Nawaz recommended that Plaintiff continue taking Zoloft, started her on Wellbutrin, and planned a follow-up appointment. Tr. 207.

Records of BJC Health Center dated January 26, 2005, reflect that Plaintiff presented complaining of sinus congestion; that she had a history of carpal tunnel syndrome, GERD, and depression/anxiety; that her medications including Prilosec, Wellbutrin, and Zoloft; that Plaintiff was alert, her mood/affect were normal; that she had no motor or sensory deficit; that the assessment on this date was that Plaintiff had CTS, anxiety, and rhinitis; and that the plan included Plaintiff's continuing to take her medications. Tr. 266.

A Progress Note from BJC Medical Group dated January 28, 2005, states that Plaintiff "comes in today for a form to be filled out for Department of Family Services"; that Plaintiff's history

included hypothyroidism, GERD, anxiety, rhinitis, and CTS; that at the time of the visit Plaintiff was taking Prilosec, Levoxl, Zoloft, Wellbutrin, and Alavert; that Plaintiff was a smoker and had no history of drug use; that Plaintiff had no chest pain, shortness of breath, sore throat, GI, GU, cardiovascular, or skin or musculoskeletal complaints that day; that she had "chronic sinus drainage"; that Plaintiff was "oriented x 3", that she had normal mood and affect; that her examination was "essentially normal"; and that Plaintiff was advised to continue on her medications and return for a follow up in three months. Tr. 264.

Dr. Nawaz reported on February 18, 2005, that the Plaintiff said that she was "feeling ok"; that Plaintiff's affect was "appropriate"; that Plaintiff's appearance, motor activity, and speech were normal; that her mood was "ok"; that her thought processes were logical and organized; that her thought content was normal; that Plaintiff was oriented as to time, place, and person; that her insight and judgment were fair; and that Plaintiff's next appointment with Dr. Nawaz was in two months. Dr. Nawaz's diagnosis on this date was "MDD personality disorder NOS." Tr. 204.

On March 2, 2005, Dr. Nawaz completed a Physician's Certification/Disability Evaluation form for the Missouri Department of Social Services on which form Dr. Nawaz reported that Plaintiff's diagnosis was as follows: Axis I, "Major depressive disorder (recurrent)"; Axis II, "Personality disorder NOS"; Axis III, hypothyroidism, appendectomy, and gallbladder removal; and Axis V, "50." Dr. Nawaz checked a box on this form indicating that Plaintiff had a mental disability which would prevent her from engaging in employment or gainful activity for a duration of six to twelve months. Tr. 195-96.

Records from the Community Counseling Center reflect that the Plaintiff was a "no show" for an April 15, 2005 appointment. Tr. 202.

In a Physician's Progress Note dated May 13, 2005, Dr. Nawaz reported that Plaintiff was "doing fairly well"; that Plaintiff was "not very well groomed"; that she continued to have financial problems; that she had a court date for "meth charges"; that Plaintiff's motor activity and speech were normal; that her mood was "ok"; that her affect appropriate; that her thought processes logical and organized; that nothing abnormal was reported in regard to her thought content; that Plaintiff did not report any suicidal or homicidal thoughts; that her insight and judgment were poor; and that Plaintiff was to continue her medication and to return in two months. Dr. Nawaz's diagnosis on this date included major depressive disorder and personality disorder NOS. Tr. 200.

Licensed Psychologist Joseph W. Monolo evaluated Plaintiff on June 22, 2005. Psychologist Monolo reported that his assessment included a review of medical notes from the BJC Medical Group, an interview with Plaintiff and her husband, and a mental status evaluation. Psychologist Monolo reported that Plaintiff said that she had a GED and had completed a three year business college program in stenography; that she had previously worked as a secretary, a police dispatcher, at a grocery store, and cleaning homes; that she last worked in February 2003 as a payday loan officer from which job she was "fired because she could not 'keep numbers and figures straight'"; that she had a thyroid problem, endometriosis, acid reflux, allergy and sinus problems, was going through menopause, and had surgery on her right hand for CTS; that the surgery for CTS did not "fully repair the problem, which causes [Plaintiff] to have difficulty holding objects and drop items"; that Plaintiff saw a psychiatrist for the first time after threatening to kill a case worker "in order to get help for her daughter who, per [Plaintiff], has manic depression"; that in 2001 Plaintiff "entered outpatient psychiatric care and counseling, which she maintained for six months"; that Plaintiff went "berserk" in 2004 at a DDS office because she needed psychiatric care; that Zoloft was effective and she was

"not as irritable or edgy" with Zoloft; that she does not remember to take her medications every day; that she is irritable and depressed on a daily basis; that she often wants to be left alone and "does not want to 'function'"; that her depression became "most apparent in 2002 after her father-in-law died, her son moved from the home, her husband was unable to work and she and her husband filed for bankruptcy"; that the less she is around her daughter the happier she is; that her energy is low; that her interest and enjoyment are limited to her four-year-old grandson; that at times the grandson is too much for her to handle; that her appetite is minimal; that she "typically sleeps two or three hours and then is awake, sometimes not returning to sleep"; that she gets out of bed daily; that she "may or may not shower on a daily basis"; that she spends much of her day lying on the couch and watching television; that she enjoys gardening, does laundry, and "makes simple foods such as cereal sandwiches or frozen pizzas"; that she does laundry; that she and her husband share household chores; that she cares for the family's two dogs; that when driving she cannot remain she focused on the road; that she does not like to drive; that she occasionally drives to pick up her grandson; that she leaves her home "three to four times per week"; that she does not go to the grocery store without her husband; and that she no longer was active in her church. Psychologist Monolo further reported that Plaintiff and her husband stated that Plaintiff "has always been abrupt and confrontational with people" and that "[Plaintiff] stated she typically does not associate with people because she is 'easily annoyed.'" Psychologist Monolo noted that he believed the Plaintiff and her husband were reliable informants. Tr. 213-15.

Psychologist Monolo further reported that Plaintiff was appropriately dressed, adequately groomed, attentive, and "exhibited no unusual movements or mannerisms"; that her affect fluctuated between "tense and agitated" to "angry" to "smiling and pleasant"; that initially Plaintiff appeared

agitated "perhaps due to being lost and late for her appointment"; that Plaintiff was cooperative, made appropriate eye contact and "established a good rapport; that her speech was clear and her commentary was "coherent, logical and relevant, but she was talkative and at times somewhat tangential"; that she was reality oriented, displayed no loosening of associations or delusional thinking or other features associated with disordered thought; that she denied perceptual disturbances; that Plaintiff "noted that she had suicidal thoughts prior to taking medication, but these [did] not occur at [the time of the evaluation]"; that Plaintiff's immediate memory and concentration were intact; and that Plaintiff "evidenced intact basic judgment and reasoning." Tr. 215.

Psychologist Monolo concluded that menopause was "likely contributing but not ... solely responsible for [Plaintiff's] mood problems given her history"; that Plaintiff is able to understand, and remember simple instructions; that Plaintiff's ability to "manage work-related stress and pressure, however would be compromised by her low mood and irritability"; and that Plaintiff's "mood and functioning may improve with continued psychiatric treatment supplemented by counseling." Psychologist Monolo's Diagnostic Impression was as follows: Axis I, "Major Depressive Disorder Recurrent"; Axis II, "No diagnosis"; Axis III, "Endometriosis, acid reflux, allergies, sinus problems, menopause, thyroid problem (all per client)"; Axis IV, "Unemployed, limited income, financial problems"; and Axis V, a GAF of 50 "(current with medication)." Tr. 216.

On July 26, 2005, Marsh J. Toll, Psy. D., completed a psychiatric review technique form in which he reported that Plaintiff has a mild restriction in regard to activities of daily living and in regard to maintaining concentration; that Plaintiff has a moderate limitation in regard to difficulties in maintaining social functioning; and that Plaintiff has no limitation in regard to episodes of decompensation of extended duration. Tr. 141.

Dr. Marsh completed a Mental Residual Functional Capacity ("RFC") Assessment on July 26, 2005. In this RFC Assessment Dr. Marsh concluded that Plaintiff was moderately limited in her ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentrations for extended periods, ability to work in coordination with or proximity to others without being distracted by them, ability to make simple work-related decisions, and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Marsh further concluded that Plaintiff had no significant limitation in any other area. Dr. Marsh also stated that Plaintiff's statements concerning her alleged limitations "are considered minimally credible as they are inconsistent with the totality of the evidence within the file. It is reasonable for [Plaintiff] to perform simple repetitive tasks away from the general public." Tr. 145-47.

## IV.
## LEGAL STANDARDS

Under the Social Security Act, the Commissioner has established a five-step process for determining whether a person is disabled. 20 C.F.R. §§ 416.920, 404.1529. "'If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled.'" Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (quoting Eichelberger v. Barnhart, 390 F.3d 584, 590-91 (8th Cir. 2004)). In this sequential analysis, the claimant first cannot be engaged in "substantial gainful activity" to qualify for disability benefits. 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental

ability to do basic work activities …" Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007) (quoting Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001) (citing Nguyen v. Chater, 75 F.3d 429, 430-31 (8th Cir. 1996)). Third, the ALJ must determine whether the claimant has an impairment which meets or equals one of the impairments listed in the regulations. 20 C.F.R. §§ 416.920(d), 404.1520(d); Part 404, Subpart P, Appendix 1. If the claimant has one of, or the medical equivalent of, these impairments, then the claimant is per se disabled without consideration of the claimant's age, education, or work history. Id. Fourth, the impairment must prevent claimant from doing past relevant work. 20 C.F.R. §§ 416.920(e), 404.1520(e). The burden rests with the claimant at this fourth step to establish his or her RFC. Eichelberger, 390 F.3d at 590-91; Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); Young v. Apfel, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). The ALJ will review a claimant's residual functional capacity and the physical and mental demands of the work the claimant has done in the past. 20 C.F.R. §§ 404.1520(f). Fifth, the severe impairment must prevent claimant from doing any other work. 20 C.F.R. §§416.920(g), 404.1520(g). At this fifth step of the sequential analysis, the Commissioner has the burden of production to produce evidence of other jobs in the national economy that can be performed by a person with the claimant's RFC. Young, 221 F.3d at 1069 n.5. If the claimant meets these standards, the ALJ will find the claimant to be disabled. "The ultimate burden of persuasion to prove disability, however, remains with the claimant." Id. See also Harris v. Barnhart, 356 F.3d 926, 931 n.2 (8th Cir. 2004) (citing 68 Fed. Reg. 51153, 51155 (Aug.26, 2003)); Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

Even if a court finds that there is a preponderance of the evidence against the ALJ's decision, that decision must be affirmed if it is supported by substantial evidence. Clark v. Heckler, 733 F.2d 65, 68 (8th Cir. 1984). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002). See also Cox v. Astrue, 495 F.3d 614, 617 (8th Cir. 2007). In Bland v. Bowen, 861 F.2d 533 (8th Cir. 1988), the Eighth Circuit Court of Appeals held:

> [t]he concept of substantial evidence is something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the Secretary may decide to grant or deny benefits without being subject to reversal on appeal.

Id. at 535. See also Lacroix v. Barnhart, 465 F.3d 881, 885 (8th Cir. 2006) ("[W]e may not reverse merely because substantial evidence exists for the opposite decision.") (quoting Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996)); Hartfield v. Barnhart, 384 F.3d 986, 988 (8th Cir. 2004) ("[R]eview of the Commissioner's final decision is deferential.").

An administrative decision which is supported by substantial evidence is not subject to reversal merely because substantial evidence may also support an opposite conclusion or because the reviewing court would have decided differently. Krogmeier, 294 F.3d at 1022 (internal citations omitted). See also Eichelberger, 390 F.3d at 589; Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000) (quoting Terrell v. Apfel, 147 F.3d 659, 661 (8th Cir. 1998)); Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001) (internal citations omitted).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court is required to review the administrative record as a whole and to consider:

> (1) The findings of credibility made by the ALJ;

(2) The education, background, work history, and age of the claimant;

(3) The medical evidence given by the claimant's treating physicians;

(4) The subjective complaints of pain and description of the claimant's physical activity and impairment;

(5) The corroboration by third parties of the claimant's physical impairment;

(6) The testimony of vocational experts based upon proper hypothetical questions which fairly set forth the claimant's physical impairment; and

(7) The testimony of consulting physicians.

Brand v. Sec'y of Dept. of Health, Educ.& Welfare, 623 F.2d 523, 527 (8th Cir. 1980); Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989).

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1)(A); 42 U.S.C. § 423(d)(1)(A).

"While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced."  Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  When evaluating evidence of pain, the ALJ must consider:

(1) the claimant's daily activities;

(2) the subjective evidence of the duration, frequency, and intensity of the claimant's pain;

(3) any precipitating or aggravating factors;

(4) the dosage, effectiveness, and side effects of any medication; and

(5) the claimant's functional restrictions.

Baker v. Sec'y of Health & Human Servs., 955 F.2d. 552, 555 (8th Cir. 1992); Polaski, 739 F.2d at 1322. The absence of objective medical evidence is just one factor to be considered in evaluating the plaintiff's credibility. Id. The ALJ must also consider the plaintiff's prior work record, observations by third parties and treating and examining doctors, as well as the plaintiff's appearance and demeanor at the hearing. Id.; Cruse, 867 F.2d at 1186.

The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. Guillams v. Barnhart, 393 F.3d 798, 801 ; Masterson v. Barnhart, 363 F.3d 731, 738 (8th Cir. 2004); Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003); Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995). It is not enough that the record contains inconsistencies; the ALJ must specifically demonstrate that he considered all of the evidence. Robinson, 956 F.2d at 841; Butler v. Sec'y of Health & Human Servs., 850 F.2d 425, 429 (8th Cir. 1988). The ALJ, however, "need not explicitly discuss each Polaski factor." Strongson v. Barnhart, 361 F.3d 1066, 1072 (8th Cir. 2004). The ALJ need only acknowledge and consider those factors. Id. Although credibility determinations are primarily for the ALL and not the court, the ALJ's credibility assessment must be based on substantial evidence. Rautio v. Bowen, 862 F.2d 176, 179 (8th Cir. 1988); Millbrook v. Heckler, 780 F.2d 1371, 1374 (8th Cir. 1985).

## V.
## DISCUSSION

The issue before the court is whether substantial evidence supports the Commissioner's final determination that Plaintiff was not disabled. Onstead, 962 F.2d at 804. Even if there is substantial evidence that would support a decision opposite to that of the Commissioner, the court must affirm

21

his decision as long as there is substantial evidence in favor of the Commissioner's position. Krogmeier, 294 F.3d at 1022.

Plaintiff alleges that the ALJ's decision is not supported by substantial evidence. In particular, Plaintiff contends the ALJ's determination of her RFC was not consistent with Singh v. Apfel, 222 F.3d 451 (8th Cir. 2000), and Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001); that the ALJ failed to properly evaluate the medical opinion evidence; that the ALJ gave improper weight to the opinions of Dr. Toll and of Psychologist Monolo; that the ALJ's determination of Plaintiff's RFC is not supported by acceptable medical evidence; and that the ALJ posed a flawed hypothetical to the VE.

**A.     ALJ's Consideration of the Medical Evidence:**

As stated above, Plaintiff contends that the ALJ gave improper weight to a non-examining psychologist, Dr. Toll, and to the opinion of Psychologist Monolo who evaluated Plaintiff and that the ALJ's decision is not supported by the medical evidence. "It is the ALJ's function to resolve conflicts among the various treating and examining physicians." Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002) (internal quotation marks omitted). The opinions and findings of the plaintiff's treating physician are entitled to "controlling weight" if that opinion is "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record.'"  Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527(d)(2) 2000)).  Indeed, if they are not controverted by substantial medical or other evidence, they are binding.  Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000)(citing Ghant v. Bowen, 930 F.2d 633, 639 (8th Cir.1991); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir.1998)).  However, while the opinion of the treating physician should be given great weight, this is true only if the treating physician's opinion is based on sufficient medical data.

Chamberlain v. Shalala, 47 F.3d 1489, 1494 (8th Cir. 1995) (citing Matthews v. Bowen, 879 F.2d 422, 424 (8thCir.1989) (holding that opinions of treating doctors are not conclusive in determining disability status and must be supported by medically acceptable clinical or diagnostic data). See also Hacker v. Barnhart, 459 F.3d 934, 9937 (8th Cir. 2006) (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight is not given to the RFC assessment); Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (holding that a treating physician's opinion is giving controlling weight "if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence"). "Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001).

A treating doctor's checkmarks on a form, however, are conclusory opinions which can be discounted if contradicted by other objective medical evidence. Stormo, 377 F.3d at 805-06; Hogan 239 F.3d at 961; Social Security Ruling 96-2p, (July 2, 1996). Where diagnoses of doctors are not supported by medically acceptable clinical and laboratory diagnostic techniques, the court need not accord such diagnoses great weight. Veal v. Bowen, 833 F.2d 693, 699 (7th Cir. 1987). An ALJ may "discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Prosch, 201 F.3d at 1013. See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006) (holding that an ALJ may give a treating doctor's opinion limited weight if it is inconsistent with the record).

A physician's opinion that a claimant is not able to return to work "involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner

gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). Moreover, a brief, conclusory letter from a physician stating that the applicant is disabled is not binding on the Secretary. Ward v. Heckler, 786 F.2d 844, 846 (8th Cir.1986) (per curiam) ("Even statements made by a claimant's treating physician regarding the existence of a disability have been held to be properly discounted in favor of the contrary medical opinion of a consulting physician where the treating physician's statements were conclusory in nature."). See also Hacker, 459 F.3d at 937 (holding that where a treating physician's notes are inconsistent with his or her RFC assessment, controlling weight should not be given to the RFC assessment); Chamberlain, 47 F.3d at 1494; Barrett v. Shalala, 38 F.3d 1019, 1023 (8th Cir.1994) (citing Thomas v. Sullivan, 928 F.2d 255, 259 (8th Cir.1991)); King v. Heckler, 742 F.2d 968, 973 (6th Cir. 1984) (holding that the ALJ is not bound by conclusory statements of total disability by a treating physician where the ALJ has identified good reason for not accepting the treating physician's opinion, such as its not being supported by any detailed, clinical, diagnostic evidence). On the other hand, a treating physician's observations should not necessarily be treated as conclusory where the doctor had "numerous examinations and hospital visits" with a claimant. See Turpin v. Bowen, 813 F.2d 165, 171 (8th Cir.1987).

When considering the weight to be given the opinion of a treating doctor, the entire record must be evaluated as a whole. Wilson v. Apfel, 172 F.3d 539, 542 (8th Cir. 1999) (quoting Cruze v. Chater, 85 F.3d 1320, 1324-25 (8th Cir. 1996) ("Although a treating physician's opinion is generally entitled to substantial weight, such opinion does not automatically control, since the record must be evaluated as a whole."). "'It is the ALJ's function to resolve conflicts among the various treating and examining physicians.'" Tindell v. Barnhart, 444 F.3d 1002, 1004 (8th Cir.2006) (quoting Vandenboom v. Barnhart, 421 F.3d 745, 749-50 (8th Cir. 2005) (internal marks omitted). While a

treating doctor's opinion is not controlling, "it may assist an ALJ [in] determining whether a claimant is disabled." Samons v. Astrue, slip op. 06-2289 (Aug. 13, 2007) (citing Bergmann v. Apfel, 207 F.3d 1065, 1070-71 (8th Cir. 2000)).

In regard to his consideration of the medical records, the ALJ considered in great detail the January 27, 2004 report of Dr. Kamath who saw Plaintiff for an evaluation. Significantly, Dr. Kamath reported that Plaintiff could comprehend and follow basic instructions and perform simple repetitive tasks. Also, Dr. Kamath assigned Plaintiff a GAF of 55 which indicates that her limitations are moderate and reported that Plaintiff needed to be on medications but was not taking them because she could not afford them. Conditions which can be controlled by treatment are not disabling. See Estes, 275 F.3d at 725; Murphy, 953 F.2d 383, 384 (8th Cir. 1992); Warford v. Bowen, 875 F.2d 671, 673 (8th Cir. 1989). Moreover, a claimant's failure to comply with prescribed medical treatment is inconsistent with allegations of disability. Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996). Despite a plaintiff's argument that she is unable to afford prescription medication, an ALJ may discredit an allegation of disability where there is no evidence that the claimant sought treatment available to indigents. Clark v. Shalala, 28 F.3d 828, 831 n.4 (8th Cir. 1994). Even assuming that Plaintiff's financial resources were insufficient, failure to seek treatment offered to indigents detracts from her claim that she did not seek medical treatment because of inadequate financial resources. See Riggins, 177 F.3d at 693.

The ALJ also considered the psychiatric evaluation prepared by Psychologist Major on December 29, 2004, including his finding that Plaintiff has a GAF of 55, which as stated above, indicates moderate limitations.

The ALJ further considered in great detail Dr. Nawaz's January 21, 2006 report from a

psychiatric evaluation of Plaintiff. Indeed, Dr. Nawaz reported on this date that Plaintiff's attention, concentration, and memory were intact; that Plaintiff's mood was ok; and that she was alert and oriented. The ALJ also considered a form completed by Dr. Nawaz in March 2005. While Dr. Nawaz checked a box indicating that Plaintiff had a mental disability which would prevent her from working, the ALJ was not bound by this conclusory statements of total disability to the extent Dr. Nawaz's records themselves are inconsistent with such a conclusion and to the extent the checkmarks are contradicted by other objective medical evidence in the record. See Ellis, 392 F.3d at 994; Stormo, 377 F.3d at 805-06; Hogan, 239 F.3d at 961; Ward, 786 F.2d at 846. Indeed, in January 2005 Dr. Nawaz reported that Plaintiff's attention, concentration, and memory were intact and that she was alert and oriented. Further, the record does not reflect that Dr. Nawaz examined Plaintiff on the date the disability form was completed. As noted by the ALL, the record reflects that Plaintiff saw Dr. Nawaz only once after Dr. Nawaz completed the March 2005 form, in May 2005, and on that occasion Dr. Nawaz reported that Plaintiff was doing "fairly well"; that her mood was ok; that her affect was appropriate; that her thought process logical and organized, and that there was nothing abnormal in regard to the content of Plaintiff's thought. See Stormo, 377 F.3d at 805-06; Hogan 239 F.3d at 961; King, 742 F.2d at 973. Further, Plaintiff cancelled two scheduled appointments with Dr. Nawaz. Plaintiff's failure in this regard detracts from her credibility regarding the severity of her complaints. See Eichelberger, 390 F.3d at 590-91.

The ALJ also considered the opinion of Psychologist Monolo who saw Plaintiff on a consulting basis. The Eighth Circuit holds that the opinions of consulting doctors may constitute substantial evidence. Hight v. Shalala, 986 F.2d 1242, 1244 n.1 (8th Cir. 1993). The ALJ considered that Psychologist Monolo reported that Plaintiff's mood and functioning may improve with continued

psychiatric treatment and counseling. Psychologist Monolo also reported that Plaintiff said Zoloft

was effective. See Estes, 275 F.3d at 725; Murphy, 953 F.2d at 384; Warford, 875 F.2d at 673;

James, 870 F.2d at 450. Psychologist Monolo also reported that Plaintiff said that she did not

remember to take her medications every day. See Brown, 87 F.3d at 965. The ALJ further considered

that Psychologist Monolo assigned Plaintiff a GAF of 50 but that such a GAF was inconsistent with

his other findings regarding Plaintiff's ability to understand, remember, and follow simple

instructions.[3] Significantly, Psychologist Monolo was a consulting doctor who saw Plaintiff only once.

Moreover, Dr. Kamath and Psychologist Major reported that Plaintiff has a GAF of 55. As such, the

court finds that the ALJ properly discounted Psychologist Monolo's report to the extent it said that

Plaintiff has a GAF of 50. See Hacker, 459 F.3d at 993.

Dr. Toll completed a psychiatric review based on Plaintiff's medical records and did not report

that Plaintiff had any severe limitations. The ALJ did not rely solely on the opinion of Dr. Toll

although as a psychologist Dr. Toll is an acceptable medical source. See 20 C.F.R. § 404.1513.

Further, the report of a non-treating medical source may be sufficient to support an ALJ's findings

"where a treating physician renders inconsistent opinions that undermine the credibility of such

opinions." Hacker, 459 F.3d at 937. "'It is well settled that an ALJ may consider the opinion of an

independent medical advisor as one factor in determining the nature and severity of a claimant's

---

[3]     The court notes that Dr. Nawaz also reported that Plaintiff has a GAF of 50. This
finding is inconsistent with Dr. Nawaz's other findings set forth above. Further, while a GAF
score may be helpful in assisting an ALL's formulating a determination, it "is not essential to the
RFC's accuracy." Howard v. Comm'r of Social Security, 276 F.3d 235, 241 (6th Cir. 2002).
Recent Regulations state that the GAF scale "does not have a direct correlation to the severity
requirements in our mental disorders listings." 65 Fed. Reg. 5046, 50764-65, 2000 WL 1173632
(Aug. 21, 2000).

impairment.'" Id. at 939 (quoting Harris v. Barnhart, 356 F.3d 926, 931 (8th Cir.2004)). "The regulations specifically provide that the opinions of non-treating physicians may be considered. 20 C.F.R. §404.1527(f)." Id.

The court recognizes that in some respects medical opinions in the record are inconsistent. It is not the job of the district court, however, to re-weigh the evidence or review the factual record de novo. Cox, 495 F.3d at 617; Guillams, 393 F.3d at 801; McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1994); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992). Instead, the district court must simply determine whether the quantity and quality of evidence is enough so that a reasonable mind might find it adequate to support the ALJ's conclusion. Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001) (citing McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Weighing the evidence is a function of the ALJ, who is the fact-finder. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). See also Onstead v. Sullivan, 962 F.2d 803, 804 (8th Cir. 1992) (holding that an ALJ's decision is conclusive upon a reviewing court if it is supported by "substantial evidence"). In the matter under consideration, consistent with the ALJ's decision, there is substantial evidence that the Plaintiff's memory and concentration are intact; that she has the ability to understand and follow simple instructions; that her mood and affect are appropriate; and that she has only moderate limitations in regard to working in coordination with others, getting along with coworkers without distracting them or exhibiting behavior extremes. Also, consistent with the ALJ's decision, there is substantial evidence that Plaintiff does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The court finds that the ALJ properly considered the medical records including the records, reports, and opinions of examining, non-examining, treating, non-treating, and consulting

psychologists, counselors, and doctors including Dr. Toll, Psychologist Monolo, and Dr. Nawaz. The court finds, in regard to the ALJ's consideration of the medical records, that his decision is supported by substantial evidence and that it is consistent with the case law and Regulations.

**B.      The ALJ's Determination of Plaintiff's RFC:**

Plaintiff contends that the ALJ's finding in regard to her RFC is not supported by substantial evidence because the ALJ relied on the opinion of Dr. Toll. The court has found above that the ALJ gave proper weight to the opinion of doctors, psychologists, and counselors of record including Dr. Toll.

The Regulations define RFC as "what [the claimant] can still do" despite his or her "physical or mental limitations." 20 C.F.R. § 404.1545(a). "When determining whether a claimant can engage in substantial employment, an ALJ must consider the combination of the claimant's mental and physical impairments." Lauer, 245 F.3d at 703. "The ALJ must assess a claimant's RFC based on all relevant, credible evidence in the record, 'including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) (quoting McKinney v. Apfel, 228 F.3d at 863). See also Anderson v. Shalala, 51 F.3d. 779 (8th Cir. 1995). To determine a claimant's RFC, the ALJ must move, analytically, from ascertaining the true extent of the claimant's impairments to determining the kind of work the claimant can still do despite his or her impairments. Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a "'claimant's residual functional capacity is a medical question.'" Lauer, 245 F.3d at 704 (quoting Singh, 222 F.3d at 451. The Eighth Circuit clarified in Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir.2000) (per curiam ), must support the determination of the claimant's RFC, and the ALJ should

obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' <u>Nevland v. Apfel</u>, 204 F.3d 853, 858 (8th Cir.2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." <u>Id.</u> <u>See</u> <u>also</u> <u>Eichelberger</u>, 390 F.3d at 591.

RFC is "an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities." SSR 96-8p, 1996 WL 374184, at *2 (S.S.A. July 2, 1996). Additionally, "RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis, and the RFC assessment must include a discussion of the individual's abilities on that basis." <u>Id.</u> Moreover, "[i]t is incorrect to find that an individual has limitations or restrictions beyond those caused by his or her medical impairment(s) including any related symptoms, such as pain." <u>Id.</u>

"RFC is an issue only at steps 4 and 5 of the sequential evaluation process." <u>Id.</u> at *3. As stated above, at step 4 the claimant has the burden of persuasion to demonstrate his or her RFC. <u>Stormo</u>, 377 F.3d at 806. "If a claimant establishes [his or] her inability to do past relevant work, then the burden of proof shifts to the Commissioner." <u>Goff</u>, 421 F.3d at 790 (citing <u>Eichelberger</u>, 390 F.3d at 591). In contrast to the first four steps of the sequential evaluation where the claimant carries the burden of proof, the Commissioner has the burden of production at step 5. <u>Charles v. Barnhart</u>, 375 F.3d 777, 782 n.5 (8th Cir. 2004). At step 5 "[t]he burden of persuasion to prove disability and to demonstrate RFC remains on the claimant, even when the burden of production shifts to the Commissioner." <u>Goff</u>, 421 F.3d at 790. Also, at step 5, where a claimant's RFC is expressed in terms of exertional categories, it must be determined whether the claimant can do the full range of

work at a given exertional level. The claimant must be able to "perform substantially all of the exertional and nonexertional functions required in work at that level. Therefore, it is necessary to assess the individual's capacity to perform each of these functions in order to decide which exertional level is appropriate and whether the individual is capable of doing the full range of work contemplated by the exertional level." Id.

The Eighth Circuit has held in Eichelberger, 390 F.3d at 591, as follows:

> A disability claimant has the burden to establish her RFC. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004). The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations. Id. We have held that a "claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700 (8th Cir. 2001). "[S]ome medical evidence" must support the determination of the claimant's RFC, Dykes v. Apfel, 223 F.3d 865, 867 (8th Cir. 2000) (per curiam), and the ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000).

Based on the record as a whole that ALJ concluded that Plaintiff "requires a job that involves low social interaction." The ALJ also considered that Plaintiff's ability to perform work at all exertional levels is compromised by non-exertional limitations.[4] In particular, the ALJ found that Plaintiff has moderate limitations in the restriction of activities of daily living, social functioning, and maintaining concentration, persistence or pace. The ALJ further found that Plaintiff's limitations are

---

[4]     SSR 83-10, 1983 WL 31251, at * 6, defines a nonexertional impairment as "[a]ny impairment which does not directly affect the ability to sit, stand, walk, lift, carry, push, or pull. This includes impairments which affect the mind, vision, hearing, speech, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use of the fingers for activities." SSR 83-10, 1983 WL 31251, at *7, defines nonexertional limitation as "[a]n impairment-caused limitation of function which directly affects capability to perform work activities other than the primary strength activities." SSR 83-10, 1983 WL 31251, at * 7, defines nonexertional restriction as an "impairment-caused need to avoid one or more environmental conditions in a workplace."

as follows:

> [M]oderate limitations for understanding, remembering and carrying out detailed instructions, maintaining attention and concentration for extended period, working in coordination with or in proximity to others without being distracted by them, making simple work related decisions, getting along with co-workers, and peers without distracting them or exhibiting behavioral extremes. There is no reason [Plaintiff] cannot perform tasks requiring low social interaction. The claimant should not constantly and forcefully grip/grasp with her right hand.

Tr. 14.

Upon determining Plaintiff's RFC the ALJ considered Plaintiff's treatment records. Based on these records as well as Plaintiff's testimony and the ALJ's credibility findings, the ALJ concluded that Plaintiff has limitations as found above. The court further notes that in March 2003 records of BJC reflect that Plaintiff was alert, her mood and affect were normal, she did not appear distressed, and she had no motor or sensory deficits; April 25, 2003 records of BJC reflect that Plaintiff's mood and affect were normal; Dr. Kamath reported in January 2004 that Plaintiff's memory was intact, her degree of social isolation was slight, she could comprehend and understand instructions and perform simple repetitive tasks; April 2004 records of BJC reflect that Plaintiff had no sensory or motor deficits and it not appear distressed; July and August 2004 records of BJC reflect that Plaintiff's mood and affect were normal; January 2005 records of Dr. Nawaz reflect that Plaintiff was alert and oriented and her attention and concentration were intact; January 2005 records of BJC reflect that Plaintiff was alert, her mood and affect were normal, and she had no motor or sensory deficit; Dr. Nawaz's records of February 2005 reflect that Plaintiff was oriented, her thought processes were logical and organized, and her insight and judgment were fair; in May 2005 Dr. Nawaz reported that Plaintiff's mood was ok, her affect was appropriate, and her thought process were logical and organized; and Psychologist Monolo reported in June 2005 that Plaintiff's speech was clear, her

commentary was coherent, logical and relevant, that her immediate concentration was intact, and that she evidenced basic judgment and reasoning. Also, as discussed above, Plaintiff was assigned a GAF in the moderate range on more than one occasion. The court finds, therefore, that the ALJ's decision in regard to Plaintiff's RFC is supported by substantial evidence and that it is consistent with the case law and Regulations, including <u>Lauer</u>, 245 F.3d at 704, and <u>Singh</u>, 222 F.3d at 451.

To the extent that the ALJ did not clearly set forth his finding in regard to Plaintiff's RFC, an "arguable deficiency in opinion-writing technique" does not require a court to set aside an administrative finding when that deficiency had no bearing on the outcome. <u>See</u> <u>Reynolds v. Chater</u>, 82 F.3d 254, 258 (8th Cir. 1996); <u>Carlson v. Chater</u>, 74 F.3d 869, 871 (8th Cir. 1996); <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992). The court finds that any deficiencies in the ALJ's decision writing does not affect the outcome of Plaintiff's case as the ALJ's decision regarding Plaintiff's RFC is supported by substantial evidence.

## C.    Hypothetical to the Vocational Expert:

Plaintiff alleges that the ALJ's hypothetical to the VE was flawed. If a claimant is found to have non-exertional impairments that diminish the claimant's capacity to perform the full range of jobs listed in the Guidelines, the Commissioner must solicit testimony from a VE to establish that there are jobs in the national economy that the claimant can perform. <u>Reynolds</u>, 82 F.3d at 258. Once a determination is made that a claimant cannot perform past relevant work, the burden shifts to the Commissioner to prove there is work in the economy that the claimant can perform. <u>Robinson v. Sullivan</u>, 956 F.2d at 839.

Additionally, 20 C.F.R. § 404.1560 states in relevant part in regard to a claimant who is unable to perform past relevant work:

(c) Other work.

(1) If we find that your residual functional capacity is not enough to enable you to do any of your past relevant work, we will use the same residual functional capacity assessment we used to decide if you could do your past relevant work when we decide if you can adjust to any other work. We will look at your ability to adjust to other work by considering your residual functional capacity and your vocational factors of age, education, and work experience. Any other work (jobs) that you can adjust to must exist in significant numbers in the national economy (either in the region where you live or in several regions in the country).

(2) In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors. We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work.

The ALJ in the matter under consideration found that Plaintiff has non-exertional limitations, including the limitation of low social functioning, and that these limitations prevent her from performing her past relevant work. As required by the Regulations and case law, the ALJ utilized the testimony of a VE. See Reynolds, 82 F.3d at 258. Also as required by the Regulations, because the VE found that Plaintiff cannot perform her past relevant work, the ALJ sought the VE's opinion as to whether there is other work which Plaintiff can perform which work exists in significant numbers.

In regard to the hypotheticals which the ALJ posed to the VE, an ALJ posing a hypothetical to a VE is not required to include all of a claimant's limitations, but only those which he finds credible. Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("In posing hypothetical questions to a vocational expert, an ALJ must include all impairments he finds supported by the administrative record."); Sobania v. Sec'y of Health Educ. & Human Servs., 879 F.2d 441, 445 (8th Cir. 1989);

Rautio v. Bowen, 862 F.2d 176, 180 (8th Cir. 1988). The hypothetical is sufficient if it sets forth the impairments which are accepted as true by the ALJ. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999) (holding that the ALJ need not include additional complaints in the hypothetical not supported by substantial evidence); Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001); Sobania, 879 F.2d at 445; Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985). Where a hypothetical question sets precisely sets forth all of the claimant's physical and mental impairments, a vocational expert's testimony constitutes evidence supporting the ALJ's decision. Wingert v. Bowen, 894 F.2d 296, 298 (8th Cir. 1990).

Even though a VE does not specifically recite factors in his answers, an ALJ can properly assume that the VE "framed his answers based on the factors the ALJ told him to take into account." Whitehouse v. Sullivan, 949 F.2d 1005, 1006 (8th Cir. 1991). Where an ALJ's hypotheticals include all of a claimant's impairments as supported by the record and the expert limits his opinion in this regard, an ALJ may rely on the vocational expert's testimony. Jones v. Chater, 72 F.3d 81, 82 (8th Cir. 1995).

As stated above, the ALJ in the matter under consideration found that Plaintiff has non-exertional limitations and a limitation in regard to grip. As such, these were the only limitations which he was required to include in a hypothetical to a VE. See Gilbert, 175 F.3d at 604; Sobania, 879 F.2d at 445. The court has set forth above the two hypotheticals which the ALJ submitted to the VE. These hypotheticals included the limitations found credible by the ALJ although the second arguably included additional limitations which the ALJ did not include in Plaintiff's RFC. The VE testified, assuming Plaintiff had the limitations stated in either hypothetical, that there are jobs in significant numbers which Plaintiff can perform and that these jobs include hand packager, office cleaner, bench assembler.

Because the hypothetical questions posed to the VE set forth all of Plaintiff's physical and mental limitations as found credible by the ALJ, the VE's testimony that there is work which Plaintiff can perform constitutes evidence supporting the ALJ's decision. See Wingert, 894 F.2d at 298. Under such circumstances, the ALJ properly relied on the testimony of the VE. See Jones, 72 F.2d at 82.

To the extent that the ALJ did not clearly set forth Plaintiff's RFC in his hypotheticals to the VE, this deficiency in decision writing does not require the court to set aside the ALJ's decision because this deficiency had no bearing on the outcome. See Reynolds, 82 F.3d at 258; Carlson, 74 F.3d at 871; Robinson, 956 F.2d at 841. In conclusion, the court finds that the decision of the ALJ in regard to the hypotheticals posed to the VE is based on substantial evidence on the record and is consistent with the case law and Regulations. Additionally, the ALJ's decision that there is work which Plaintiff, given her RFC, can perform and that such work is available in sufficient numbers is supported by substantial evidence on the record as a whole and is consistent with the case law and Regulations.

**D.     Polaski:**

As set forth more fully above, the ALJ's credibility findings should be affirmed if they are supported by substantial evidence on the record as a whole and a court cannot substitute its judgment for that of the ALJ. Guillams, 393 F.3d at 801; Hutsell, 892 F.2d at 750; Benskin, 830 F.2d at 882. To the extent that the ALJ did not specifically cite Polaski, case law, and/or Regulations relevant to a consideration of Plaintiff's credibility, as also more fully set forth above, this is not necessarily a basis to set aside an ALJ's decision where the decision is supported by substantial evidence. Randolph v. Barnhart, 386 F.3d 835, 842 (8th Cir. 2004); Wheeler v. Apfel, 224 F.3d 891, 896 n.3 (8th Cir. 2000); Reynolds v. Chater, 82 F.3d 254, 258 (8th Cir. 1996); Montgomery v. Chater, 69 F.3d273, 275 (8th

Cir. 1995). Additionally, an ALJ need not methodically discuss each Polaski factor if the factors are acknowledged and examined prior to making a credibility determination; where adequately explained and supported, credibility findings are for the ALJ to make. See Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000)). See also Tucker v. Barnhart, 363 F.3d 781, 783 (8th Cir. 2004) ("The ALJ is not required to discuss each Polaski factor as long as the analytical framework is recognized and considered."); Strongson, 361 F.3d at 1072; Brown v. Chater, 87 F. 3d 963, 966 (8th Cir. 1996). In any case, "[t]he credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). "If an ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, [a court] will normally defer to the ALJ's credibility determination." Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003). See also Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006). The court has addressed above, in the context of Plaintiff's arguments, many of the factors which the ALJ considered upon discrediting Plaintiff's allegations. Additionally, for the following reasons, the court finds that the reasons offered by the ALJ in support of his credibility determination are based on substantial evidence.

First, the ALJ considered that a statement in the record, dated December 2003, reflected that Plaintiff had been seeking work as of October 23, 2003, and that this date was after Plaintiff's alleged onset date of April 2003. "Acts which are inconsistent with a claimant's assertion of disability reflect negatively upon that claimant's credibility." Johnson v. Apfel, 240 F.3d 1145, 1148049 (8th Cir. 2001). "Working generally demonstrates an ability to perform a substantial gainful activity." Goff, 421 F.3d at 792 (citing Nabor v. Shalala, 22 F.3d 186, 188-89 (8th Cir. 1994)). Seeking work after an alleged onset of disability is inconsistent with a claim of disability. Donahoo v. Apfel, 241 F.2d 1033, 103( 8th Cir. 2001).

Second, the ALJ considered Plaintiff's low earning history and noted that Plaintiff had only four years with earnings over $10,000. An ALJ may discount a claimant's credibility based upon her poor work record. Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

Third, the ALJ considered that Plaintiff's subjective claims were inconsistent with her daily activities. The record reflects that Plaintiff stated on a Social Security form that since her alleged onset date she does laundry, dishes, makes beds, vacuums, takes out the trash, mows the law, gardens, banks, goes to the post office, and drives fifteen miles once or twice a week. Tr. 50, 51. Also, a report dated July 12, 2005, states that Plaintiff acknowledged that she accomplishes her personal care without difficulty, cooks, cleans, drives, and shops regularly." This report further states that Plaintiff enjoys watching her grandsons and putting 1000 piece puzzles together." Tr. 149. Plaintiff told Psychologist Monolo that she and her husband share the household chores and that she care for the family's two dogs. Plaintiff testified that she does her own laundry and goes to the grocery store although she does this once a month. While a claimant need not be bedridden to qualify as disabled, a claimant's daily activities can nonetheless be seen as inconsistent with Plaintiff's subjective complaints of a disability. Murphy, 953 F.2d at 386; Benskin, 830 F.2d at 883. See also Onstead, 962 F.2d at 805; Bolton v. Bowen, 814 F.2d 536, 538 (8th Cir. 1987).

Fourth, the ALJ noted that Plaintiff's smoking one-half to a pack of cigarettes a day undermines her credibility in regard to her claim that she could not afford medication. The fact that a claimant does not forgo smoking to help finance medication detracts from a claimant's credibility. See Riggins v. Apfel, 177 F.3d 689, 693 (8th Cir. 1999).

## VI.
## CONCLUSION

The court finds that the ALJ's decision is supported by substantial evidence contained in

the record as a whole, and that, therefore, the Commissioner's decision should be affirmed.

**ACCORDINGLY,**

**IT IS HEREBY ORDERED** that the relief sought by Plaintiff in her Brief in Support of

Complaint is **DENIED;** Doc. 13

**IT IS FINALLY ORDERED** that a separate judgement be entered in the instant cause of

action.

/s/Mary Ann L. Medler
MARY ANN L.  MEDLER
UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of February, 2008.